Case number 23-3698, Thomas Merck v. Walmart Inc. Argument is not to exceed 15 minutes per side. Mr. Realton, you may proceed for the appellant. Good morning. Good morning, and may it please the Court. My name is Thomas Scott Realton. I represent the appellant Thomas Merck. If I may, I'd like to reserve five minutes for my rebuttal. All right. Thank you. Mr. Merck has standing to challenge Walmart's violation of the Fair Credit Reporting Act. Walmart revoked Mr. Merck's job offer based on information in a background report that he did not have the chance to review. And that alone satisfies this Court's longstanding test for informational injuries. First, Mr. Merck was denied information to which he was entitled by law, and that's undisputed at this stage of the proceedings. And second, Mr. Merck needed to show that he'd suffered some adverse effect or downstream consequences from that denial of information. And this Court has recently reiterated that's not a difficult standard. It doesn't require full, standalone Article III injury. Instead, it requires, as Chief Judge Sutton put it in Brintley, that Mr. Merck show that the information had some relevance to him, and more specifically that he had some real interest in that information. So what are the downstream consequences? So I think in this case, Mr. Merck has identified a number. And Mr. Merck was a job applicant who was denied the dispositive reason that his job offer was revoked. And that's about the most important information that you could have. That alone? That's it? So suppose he never applied for another job at Walmart. You're saying he still has standing. There's still enough downstream consequence. I think because Mr. Merck was searching for employment at the time, it was both relevant to him why his job application had gone wrong at Walmart, and it was relevant for future applications. Relevance, a downstream consequence just needs to be something relevant. I think it needs to be. Under like, I don't even know if you apply it. Evidentiary rules for relevance are how you describe relevance, but that's your standard? I thought how this Court put it in Brintley was maybe the most illuminating, which is Mr. Merck needs to show that he has some real interest in that information. And here, this information was tied to his very real interest in his eligibility for employment, in his economic interest in employment. And one example that I... Really broad. I mean, every piece of data could somehow be relevant to some interest you have. And even if we accept that it's, you know, the bar's not so high, it's not ground level. So what are the concrete things? So if he was never... Because he applied for jobs later on at Walmart, but you're not even saying that matters. It's just so long as he was theoretically looking for a job, it's enough that he received imprecise information from Walmart. I think as long as he was in the situation of someone who was looking for a job, and I do think you're absolutely right, Your Honor. The standard is not rock bottom, and I think it's important to look at other cases where this Court and the Supreme Court have rejected arguments about informational injuries. So this was not a situation where Mr. Merck was challenging the fact that his zip code was left off of the background report. This isn't a case like in TransUnion, where, as the Court said, there was no evidence that the plaintiffs had so much as opened the mailings in that case or even that they were confused. And I think this case is well on the other side of that. Mr. Merck received this incomplete information. He testified under oath that he was confused about it. He reached out to try to figure out what was going on. It had nothing to do with his job at Walmart, right? He had already been denied the job at Walmart. He misled them to the background information. So that job was gone. Well, two points on that, Your Honor. First, it's undisputed that it was an honest mistake that Mr. Merck I'll just answer the question. The injury or the concrete, the circumstance, the downstream consequence can't be the denial of that initial job he sought because he lost that for a different reason. He lost that because he'd given, even maybe well-meaning, but he gave false information. Question the intent. He gave false information to Walmart and they denied him the job on that basis. Well, here he was denied the information before they made the final employment decision at Walmart. And so the timeline is that he received this pre-adverse action report. It included the incomplete report. And then subsequently he was ultimately the final decision that was made. So you're saying that it's that job then? You're saying it's the denial of that job? That's the downstream consequence? I think that's one of the examples of the adverse effect and downstream consequences. What are the other ones? Just that he was looking for a job generally? That he had an interest in, for example, evaluating his own prospects as a job seeker. Imagine you had an energy company that's applying for a permit for a power plant from the EPA. And there's a statute that says there's an initial determination that's made and then you're provided the reasons for EPA's ultimate decision, the decision they're planning on making, and then they'll make that ultimate decision. And the energy company is denied those reasons. Now, it could be that the reason EPA denied the application was because they were never going to authorize the power plant. There was a new administration policy. It could be that EPA had granted all the permits it was going to grant for that quarter. But reapplying would have been totally fine. Do you have a lawsuit in that context? What's an EPA case? What's your lawsuit in that context? I think in that case, you could imagine a statute that either grants the company directly that right to information or they submit a FOIA request and they say, we want to know why our application was denied. FOIA is actually getting into a whole other line of cases. I'm not quite sure that's correct. I don't agree with anything I say, but aren't there other cases that talk about public information and how we look at that differently? This court in gray actually addressed that very point. In gray, there was an argument that there should be a different standard for informational injury in public records cases, and gray rejected that. Judge Lepar said, no, this is the standing inquiry, the test for adverse effects, downstream consequences. That's going to be the same across all manner of cases, including consumer protection statutes. Can I take you back to the beginning of your exchange with Judge Radler? He applied for the job, he doesn't get the job. He then did apply a couple more times. I want to put the subsequent reapplications off to the side for just a second. The problem that I'm having trying to follow this is that Walmart at least says, correctly or incorrectly, that it wouldn't have made any difference if he had seen R3, because he doesn't have the ability under the statute, or there's no other source of the ability, at least they don't think there is, that he could do anything about it. So how do we address whether there was an injury if your client was powerless to do anything, even had he been provided the R3? As you noted, Your Honor, we do dispute the question that he was categorically ineligible, and I think the record on that is not nearly as clear as Walmart makes it out to be. But to get to your question on the legal standard, we think that as the Supreme Court has recognized, an individual has an interest in advocating for themselves. And if they're denied information that would inform that advocacy, they don't need to show that that advocacy would be successful. What was the format here where he would have had the ability to advocate, had he had what you claim to be the complete information? So here he did reach out after he got the pre-adverse action report, and he says, his testimony was, if he'd had that information, then he would have used it, he would have pointed to it, he would have tried to offer that explanation. And ultimately, like a lot of advocacy, it could have turned out to be futile. But otherwise you would have a framework where if a company just says, look, we're never going to change our minds, then any individual who is denied all manner of information from their background report in the pre-adverse action letter would not even have standing to come in and sue. I mean, Walmart could have left off the conviction entirely. It could have left off the high-risk address. And so long as it can come in and say, we wouldn't have done anything different, then that would strip him of standing. And I don't think there are cases that say that if your interest in information is, for example, informing your advocacy, you have to show that it would have had some result. Although if he was categorically disqualified based on his failure to disclose, then he really doesn't have standing. Because he wasn't not hired because of the conviction on his record. He was not hired because of his failure to disclose. If that's what the company policy says and is applied across the board, not in a discriminatory way, your client really doesn't have any argument. And his subjective belief that he could have negotiated around the company policy doesn't make a whole lot of difference in terms of the standing requirement. I believe he does, and this is what the Seventh Circuit and the Third Circuit pointed out. He has an interest in pleading his case. Now, as to Walmart's policy, I think what Walmart points to in the record is just that they had not yet adopted their current policy, which allows for a more formal, it's called circumstances review policy, where they formally provide such an opportunity. But Walmart doesn't point to anything in the record that says that at the time, it would categorically ignore any explanation that Mr. Merck had given. And in fact, Walmart's employee testified that if she had talked to him, she would have discussed what had happened, and at the very least she would have told him to reapply. And so there, there's... Even though your red light's on, let's go on just really briefly to the fact that he did reapply. Now, under the circumstances of these two reapplications, as I understand it, he never got to the stage where he could explain away why he forgot to disclose it the first time around. He just submitted an application, and he wasn't given a conditional offer, so he didn't have a chance to fill in the same form that sunk him the first time and disclose it. So I'm just trying to figure out, it seems to me, maybe your argument is a little better on standing for the reapplications, but it still seems to me there are problems with that. If you could just address that for us. Absolutely, Your Honor. So I think there's two points on that. One is, if he had known what actually was the reason that it sunk his application, he could have more affirmatively reached out. And I think he was eligible for those subsequent reapplications, and it's really telling that even though the first time around he was told that he was a shoo-in and that the background check was a formality, he doesn't even get to the interview stage the second time around. And so it's because... How did, how, reach out when? So he just does something online to apply, right? Well, so, for example, Walmart's employee testified that if he had reached, if he had spoken with her, she would have said, well, you're eligible on reapplication, so you can reapply. And at that moment, he could have said, here's what happened. Here's why I left it off. It was an honest mistake. It was from 15 years ago. It was a misdemeanor. I served no jail time. I'd forgotten it. And so instead of a situation where he sends in his application, and even though he's formally eligible even under Walmart's telling, you know, he doesn't even get to the interview stage, despite being, I think, indisputably qualified, that indicates that it was that prior failure that sunk the application. So being able to address that, knowing that that was the reason, I think that would have been quite relevant to him. And, you know, similarly, if you look at the record here... All I'm trying to figure out is, what was his opportunity to address that the second time around had he been armed with that information? I think if he had been able to figure out what had happened even the first time around, and let's say taking Walmart as right, that he wasn't eligible that first time around. We don't concede that. But even if that's true, what Walmart's employee said was, if he had come and said, what's this R3 code? She would have at least told him that he was eligible to reapply. And at that moment, he could have explained to her what it was that went wrong and why he'd left it off the initial application. Even beyond that, I mean, I think... He did reapply. He still did reapply. You're saying we have to infer that there was some negative consequence from the prior... Because he did reapply. He just didn't get beyond that threshold stage. Well, I think here, and again, this is important, I don't think it's his burden to show that there would have been some difference. I don't think that's the inquiry in the informational injury context. There's got to be some injury. He wasn't prevented from applying. The injury is, I think, he would have used it to evaluate and inform that application. He could have told... How? Isn't it just like a check-the-boxes kind of application? Like, where on that application would he have informed the discussion? Well, he could have... I mean, talking to the Walmart employee the first time around. That's not the application. He could have explained it to her. That's not the application. Well, I think then, once the Walmart employees knew that that was the reason that he failed the first background check, they wouldn't have just assumed... Nowhere on the application he could have listed that information. You're saying this is all a verbal conversation. I just want to understand your argument. You're saying it was all... You keep coming back to a verbal conversation he could have had. He could have called someone at the store and told them, here's the explanation. When you get my paper or electronic application, here's the background. So I don't believe that the reapplication is in the record. I will check that. So I don't know exactly what it looked like or whether there was a text box where you could have provided more information. I don't know the answer to that question. Let me try to help you out in what I think you're saying. So tell me if this is right or wrong. You're saying that had he been informed with that information, he would have done something differently the first time around that would have helped him then when he did reapply. Because he wasn't barred from reapplying. We know he reapplied twice. But the answer to my question is, well, what would have happened differently is back at the first time, after he got rejected the first time, he would have had conversations then that you're hoping would have helped him the second and third time. Is that basically it? I think I don't want to close the door on any subsequent advocacy around the reapplication, but I think that certainly on its own would be enough. And you pointed to maybe there's a different analysis in the public records context, but even if you put that aside, imagine a statute governing real estate appraisals, and it has a similar form to this statute. You get an initial notice from the appraiser with the reasons for the appraisal, and then there's a final decision down the road. And you get a low-ball appraisal in your house, but you don't get the reasons for it. Now ultimately, it could turn out that the reasons for that were that you lived in a bad neighborhood. It's totally out of your control. It could be that the appraiser had a particularly pessimistic view of the housing market. It could be that your house just needs a new coat of paint or you need to do a better job tending to your lawn. And I think in that case, under the standard articulated by this court in Brintley, you have some real interest in that information. You have a real interest in knowing it's the value of your house. That's something that really matters to you. And as this court put it in TransUnion, it quoted... Sell the house or do something. Sure, yeah. If you were looking to sell the house, much like Mr. Murph looking to apply for jobs, that's relevant information to... Right, so we get back to... It's not just to have the information, it's to have the information to act on it in a way. And so it's there, you're going to still sell your house to someone else, and in this case, it's because you're looking for another job or something. I think here the rule would only have to be, you know, if you're a job seeker, the dispositive reason you didn't get employment is of real interest to you. And so I think that would make this, you know, a particularly straightforward case. He's in the situation of someone who, he has to evaluate his job prospects, he has to think about where to apply, and he even testified, you know... Let's follow through on that for just a second. I mean, I think you make a good argument about it'd be good to know things if you... then... because you can use that to your benefit down the road. Okay, I get that. But in this case, he knew, he believed that the reason he didn't get the job is that he had a conviction, right? He gives actually... Now, is that right? He believes it was either the fact of the conviction, the high-risk address, the background check listed him as having a high-risk address in a trailer park, or the honest mistake. Sorry to... Well, at least it's one of the reasons. Yes, absolutely. But he knew that this conviction, 15 years ago, was relevant to the employer, right? Well, in this case, actually, that conviction was relevant only by its omission, and I do think that's important. He thought, when he was rejected, it was because he had a conviction, as opposed to failing to disclose the conviction, right? He wasn't sure which of those it was, but yes, it was one of the reasons he thought, absolutely. So, if he... He knew that a conviction... This reminded him of the conviction, and he knew it was important to an employer, so he was already armed with the incomplete information he got in connection with what he should do in subsequent applications. Correct? I don't believe so, because I think the different reasons he could have lost the job at Walmart would actually inform, you know, how he thinks about his applications going forward. So, if it turned out... Do you think it would have been reasonable in subsequent applications had he had the opportunity to, again, not disclose the convictions, when he knew that that was at least a possible reason he didn't get the Walmart job the first time? Not at all, no. I think it would not be reasonable to not disclose. It's more that if it... You know, he thinks that this 15-year-old conviction is disqualifying him from jobs, that's a really important piece of information for him. That's not something he can change. If he thought that it was the high-risk address for living in a trailer park, that's also not something he could change. Maybe it's something that he could bring up affirmatively with future employers and say, look, I know this thing's going to come up on my background check. It's going to say I have a high-risk address. But, let me explain. I think we have your argument in hand. You'll have your rebuttal time. Thank you very much, Your Honor. Thank you. Good morning, and may it please the Court. My name's James Boudreau of Greenberg Trowering on behalf of the Defendant Appealee, Walmart, Inc. I think one of the important points to understand before I dive into precisely what the Plaintiff just said is that this is an appeal from a grant of summary judgment. It's not like a lot of standing cases. It's not a 12B1 facial attack that comes up on appeal. This is a summary judgment case. And it informed a lot of the decision-making below because, as you may know from reading the record, that Mr. Merk, in fact, survived standing at the motion-to-dismiss stage. He lost it on appeal, or excuse me, on summary judgment because he didn't deduce any evidence of an actual harm. He stands here and relays a lot of information. Oh, I might have done this, or I could have done this, or this might have made a difference. But there's no actual evidence in the record that it would. The only evidence in the record, and it is undisputed, is that at the time in question, the policy of Walmart in the state of Ohio was that if an applicant failed to disclose their criminal conviction, there was an absolute bar to employment. They could have 60 days, and they could reapply. That's exactly what happened here. Now I want to turn... So he would say, even accepting that, in that 60-day period, had he known this information, he might have called, he might have tweaked his application, he might have done something differently. I mean, it would be informative to know that. So let's go back to the record. What happened when Mr. Merck, in fact, got the pre-adverse action, ultimately the adverse action notice in this case? He testified that he called. He can't remember whether he called Walmart or the Consumer Reporting Agency, but he called. And he wanted to know why. You know, he was looking to find out why his application was denied, but he didn't learn anything, he couldn't remember. But he did know at the time that it was either due to the conviction or the failure to disclose it. He didn't know which. But the fact of the matter is, the Fair Credit Reporting Act doesn't require an employer to tell a candidate why their employment is rejected, why the offer is revoked. The Fair Credit Reporting Act is a simple notice statute, and all it requires an employer to do, who is collecting criminal background checks on applicants, is provide a copy of the consumer report along with the FCRA summary of rights. That's it. There's no obligation on the employer to speak to a candidate, to interact with a candidate, in any way. The summary of rights under the Fair Credit Reporting Act makes clear that if there is a dispute concerning the accuracy of the underlying information, the person's remedy is to call the consumer reporting agency and correct the dispute. Why? Because the purpose of the Fair Credit Reporting Act is not to act as some super HR-type explanation process. Rather, it is to ensure that consumer reports are accurate. And frankly, also there's a privacy interest, too, to make sure that they've been properly authorized. The inaccuracy was tied to the reason for the job denial. So there was an inaccuracy, right, in the papers he received, and that inaccuracy was tied directly to... I wouldn't call it an inaccuracy. I mean, the allegation here... I don't know what you want to call it. Incompleteness. It didn't have the R3 code. There's incompleteness, but that incompleteness was tied directly to the reason why he didn't get the job. The code is shorthand for failure to disclose. Walmart understood that when it sees R3. No testimony of Mr. Merck would have known that. And Mr. Merck, in fact, I think says he doesn't, wouldn't have known what R3 meant, but that would have triggered his phone call. But again, the record shows Mr. Merck, in fact, called and asked about why he wasn't hired. That's a more pointed question than what does R3 mean. But they still didn't disclose that. The reason was the failure to disclose as opposed to the existence of the conviction. They didn't disclose that in the conversation. Correct. They're under no obligation to. The statute does not create any right to information other than the consumer report itself and the summary of rights. We're just trying to figure out whether the failure to disclose this R3 actually had some consequences that could have been changed with Walmart or had some other downstream consequences that your fellow counsel is arguing about in connection with other applications. Correct. Understood. And the reality is it didn't have downstream consequences. You can cut right to the end and say simply because of Walmart's hiring policy at the time, there was no way he was going to get the job. That's undisputed. It's the Natalie Bartlett declaration in the... But they told him, let's assume that you're right in terms of the first encounter with Walmart, but he did reapply twice and he didn't have the opportunity to then disclose, which is the reason why he didn't get the job the first time. He didn't have the opportunity because his applications weren't processed. Nobody knows why those applications weren't processed. And it's important here, and the district court pointed this out, we're at the summary judgment stage. It was Mr. Merck's responsibility to come forth with evidence that showed that those applications were impeded some way by this lack of information that he had. He offered nothing. He took discovery with Walmart. Did he ever ask the question why he didn't get the job the second and third time? I don't know that he did. I don't know that it is in the record, but it's not my job to ferret the record for him. I mean, I understand that. So your principal argument seems to me to be this is an understanding question. It's a simple lack of proof on his part that there was an injury or something remediable. That is one aspect of it. I think the problem is he's claiming an informational injury based on information that the statute doesn't entitle him to. So he gets R-3. Say he gets R-3. I get it. He's entitled to that. But then the question is that's not the harm he's claiming. He's saying, oh, then I would have known what to do and what to ask. But the record shows he did ask. Let me ask you this. Based on company policy, was he barred from employment pursuant to the subsequent applications because he had failed to disclose with respect to the first application? Would company policy have encompassed that once you fail to disclose, you're barred, which means you're also barred from subsequent applications? Within a 60-day time frame. It's a 60-day time frame. Correct. That's in the Natalie Bartlett Declaration, which is in the record at, I believe it's page 1614. All right. And the record doesn't disclose, as you said a moment ago, why he didn't even get to the interview stage in the second and third applications. Correct. So you would concede it was possible that he might have been able to prove that the problem the first time around did adversely affect him the second and third time. But he didn't. He just didn't. Yeah, I can't say. I mean, Judge Morrison took that head on and said basically exactly that. You know, you have this subjective guess as about speculation as to what might have happened. But you're in summary judgment. You need to actually submit admissible evidence that supports that. And he did not. But also keep in mind, the record does show that when he applied for employment in January of 2017 to his current employer, he did in fact disclose because he was concerned that the failure to disclose deprived him of the Walmart. Go back. You said the statute only... I think you were in essence saying the statute gets you a phone call. You're saying the statute... The remedy is you get to call the agency or call Walmart or one of the two and ask what the correct information should have been or what information you didn't receive. I can't quite understand. Because it's... The Fair Credit Reporting Act requires that if an employer is going to collect consumer background information that it first obtain an authorization from the employee. It did that here. There's no dispute about that. And then if the background report shows some information that will impact the employment, you have to send what's colloquially called a pre-adverse action letter, which is really just a copy of the consumer report and the FCRA summary of rights issued by the CFPB. That's all you get. The presumption is that's correct. The presumption is that information is correct. So here we know the information is... Well, no. The presumption is... Well, yeah. Who knows if it's correct? But then you talked about a phone call. It then says, the summary of rights says if you have a dispute about information in the background report, you can call the Consumer Reporting Agency. Because, again, Congress was concerned about accuracy. It wants correct information. And he calls... What is he told? He doesn't remember. But he does remember that as a result of the phone call... And remember, he can't recall whether he called Walmart or he called Sterling. But he does recall that as a result of the phone call, he thought it had something to do with the failure to disclose. Either the fact of the conviction or the failure to disclose it. I guess I was getting... If the right was to a phone call and they answer the phone and they say, yeah, we just won't tell you anything, that doesn't feel like you've really sort of... Well, keep in mind... It sounds like, arguably, more than that happened here. But the statute takes care of that. Because the reason they direct you to the Consumer Reporting Agency is the Consumer Reporting Agency, upon an inquiry that the report is incorrect, has a statutory obligation to investigate and either has to correct it or delete the information within a certain time frame. There are no obligations that run to the employer. The statute creates no privity between the employer and the applicant other than to send those notices. And that's what's really going on here. They're trying to gloss onto the Fair Credit Reporting Act a statutory obligation on the part of an employer to do something that it's not required to do. It's not required to give correct information.  No, that's the Consumer Reporting Agency's obligation. I mean, the information has to be correct. All the employer has to do is give you a copy of the report... It didn't do. What? Well, for purposes of summary judgment, accept that that did not occur. It didn't include the R3 code. It doesn't do that. So then the question is,  Right, that's it. What injury flowed from that failure here? And the reality is none because one, he testified, if I had known, I would have made a call. He did. Two, I would have then been informed. He already said, he testified that he knew. I guess the point is the call... I was trying to understand what happened. So he makes the call... The employer could hang up. We have a record where we can... Right. We have a record where we can try to discern whether we think he received information. And if he received information, then it seems like you're saying he's gotten all of the process or whatever. But he did receive all the information that the Fair Credit Reporting Act entitles him to from the employer. The employer doesn't have to explain why you didn't get the job. There's no statutory obligation. I just don't understand how you can say that so unequivocally when the act requires a complete copy, an accurate copy, of the report to be provided to him. I don't remember whether it says it has to come from the agency or from Walmart, but he got an arguably incomplete report. Correct. The report does not state why you're not hired. The report is just the information. But that's what R3 presumably would have done. Because you're not saying, well, even if we had told him R3, he wouldn't have known what R3 meant. You haven't said that. Well, we did say that. If he'd gotten R3, he literally would have... If he'd gotten the identical report that Walmart got, it literally said R3, and then there was two words after it, anti-competitive or something like that, or non-competitive. But anyway, R3. That's all it said. It didn't say denied employment for failure to disclose. That's not what it is. It's just the report itself. You're saying had he gotten it with R3 and he called, he wouldn't have been entitled... The act didn't entitle him to an explanation of what R3 non-competitive meant. That is correct. The employer is under no obligation to engage with the applicant at all. Let me expand the inquiry here just a slight bit without diverting us too much. We've been talking almost exclusively about the relationship between him and Walmart. Your opposing counsel, Mr. Railton, in his argument a few minutes ago, said that the other downstream consequences were that this information, had he been provided complete information, would have informed him in how to go about other jobs. That seems like a pretty good argument to me. So put Walmart off to the side for just a second. How do you respond to that argument? One, again, at the summary judgment stage, he would have to do some evidence that that is in fact the case of what he would have done or how it would have impacted him. The one thing I can say is he knew as of January 17, because when he applied in January 17, he specifically testified that he disclosed the conviction believing that the failure to disclose had impacted his employment at Walmart. That's the second application or the third? That is the non-Walmart application. That is the application after Walmart, when he got the job. He says he did disclose. Correct. Did he say that it was because, at least in part, what he learned from his Walmart experience? That was part of it. You can read the deposition testimony. It's in the record. All right. Thank you. That's helpful. Well, with my time running out, in sum, this report should affirm Mr. Merck's lack of Article III standing. It's undisputed Mr. Merck told Walmart during the application process that he did not have any prior criminal convictions, but the report, the one he received and actually the one Walmart received, although different ones, showed that he did. And he does not contest the correctness of that information. And the record evidence further shows that based on the failure to disclose, there was no world in which Walmart would have hired him at that point in time in the state of Ohio. Because of these undisputed facts, the district court correctly found Mr. Merck did not submit sufficient proof of a concrete and particularized injury due to the statutory FICRA violation he alleged. Indeed, any injury to Mr. Merck did not arise from Walmart's alleged statutory violation, that is a failure to give him the identical report. Rather, his injury resulted from his own admission on his application paperwork and Walmart's then hiring policy. That nexus is fatal to his claim of standing because he can't establish a nexus between the statutory violation and the claimed harm. The district court got it right. Thank you. Thank you, your honors. And I'd like to pick up just where your colloquy with my friend on the other side ended, which is whether Mr. Merck knew that the reason that he didn't get the Walmart job was because he'd admitted the information. And Walmart made that argument below. The court below actually rejected that argument. It said, looking at Mr. Merck's deposition testimony, the portion they're pointing to was picked out of context and actually was contrary to the rest of his deposition testimony, which I think says quite clearly that he was actually left guessing about what had happened and that he didn't know whether it was the high-risk address, whether it was the fact of the conviction itself, or whether it was just leaving it all. Post-phone call? Post-phone call? So, yes. Yeah, he was as confused pre- and post-phone call. And his testimony was also that he would have used the R3 code in the phone call. He would have said, that would have given me something I can point to. I could say, what is this R3 code? And, in fact, the credit reporting company was under a statutory obligation to have trained staff that explain what's in the background report. And that makes a lot of sense. Was somebody under an obligation, either Walmart or the credit reporting agency, to explain what R3 non-competitive meant? Yes. The credit reporting agency was under a statutory obligation to explain that information. And that's 15 U.S.C. 1681H.C. So it's the recourse that the credit agency didn't do that on the phone call, assuming that's who the call went to. Is the recourse then to sue Walmart or to sue the credit reporting agency? I think they both have their own sort of share of liability in this because Walmart was required to ensure that it didn't take any adverse action until the full report had been provided. And even if he spoke to Walmart, Walmart's employee actually, as we point out in the brief, she said, I would have explained what R3 meant. And she said, I would have told him that if it was true he left it off, he could reapply. And it's undisputed that he was eligible for those reapplications. So I think either way, he could have gotten an explanation for what R3 meant. He did reapply. He did reapply. He did, in fact, reapply. And he reapplied without knowing what the reason was. You haven't told me anything that he would have done differently in his application. In fact, you said his application is not even the record. And it would be your job to put that in the record. And you should show us something on the application that he would have done differently with this information. And he did use it with another employer. I think as Judge McKeague pointed out, that his argument is in part that during the first application process, if he'd been able to talk to someone at Walmart and explain what went wrong, then they would have had that explanation for his false mistake. It really all comes back to this conversation. I'm not saying that's positive against you. But it all comes back to this conversation he would have had. Or he would have... It wasn't anything he was going to do in writing. It was this conversation he was going to have where he was going to notify Walmart. And they were going to have that in their minds when they received his application, which would otherwise look the same as his prior application. I don't believe it all rides on that. And I think it's really important to note I think the standard here is not can he show that the outcome would have been different. This court has never required that. He has to show some injuries. He has to show some impact. He has to show some downstream consequence. He has to show that he was denied information in which he had a real interest, like the appraisal example. If you're in the business of selling your... But what's the real interest? I'm just trying to have some concrete understanding of what the real interest is. There's a lot of things I'm interested in. But there has to be some consequence. And so it can't just be having... I don't think he can be just having information. It's not just mere curiosity, certainly. But if you look at, for example, the Supreme Court's decisions in Aikens and Public Citizen, and this court in Gray cited those as examples of cases where there were adverse effects or downstream consequences. They were about public information? How you'd use information publicly? They were about public information, but Gray explained that there is not a different standard. And in those cases, it was... The information was knowing what went on in ABA committee meetings so that they... One of them was advocacy. The other one was just evaluating judicial nominees. And I think evaluating judicial nominees, that's a much more attenuated, generalized, unconcrete interest than evaluating your own job application. And that's relevant for Walmart? You say evaluating your own job. What does that mean to evaluate your own job application? The only thing I can think of is that means when you apply for your next job. And he doesn't show anything that he would've done... In terms of the application he sent in, he doesn't show anything he would've done differently to Walmart. I think it would be Walmart and other employers. And I think evaluating his application... For another employer, we know he used it. He did use it, but even his testimony in the record was that it took him months after his experience with Walmart because he was left guessing to even work up the courage to apply to that other employer. And so in this case... And that makes sense. He failed a background check, and he doesn't know why he failed it. Some of those reasons are things that they're going to keep showing up. The high-risk address that can keep showing up. The fact of the conviction that can keep showing up. And so that's quite relevant to him going forward. Which of these things are disqualifying? Which are things I can change? Which are things I can't change? Like the appraisal example, like the power plant. It could be the first time around, it's a no-go. But as long as you're in the business of or you're in the course of applying for jobs, applying for permits, getting an appraisal, that information is going to be relevant to you. All right. Okay, thanks very much. I think we have your argument. Thank you, Your Honor. And the case will be submitted.